Filed 1/29/21  P. v. Garcia CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

THE PEOPLE,

     Plaintiff and Respondent,

v.

ROBERT ANTHONY GARCIA,

     Defendant and Appellant.

E072792

(Super.Ct.No. INF1800497)

OPINION

APPEAL from the Superior Court of Riverside County.  John M. Davis, Judge. Affirmed in part, sentence vacated and remanded with directions.

Arielle Bases, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Arlene A Sevidal and Eric A. Swenson, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Robert Anthony Garcia of one count of making a criminal threat (Pen. Code, § 422; count 1; unlabeled statutory citations are to this code), three counts of

1

being a felon in possession of a firearm (§ 29800; counts 3-5), and one count each of exposing an assault weapon for sale (§ 30600, subd. (a); count 6), possession of an assault weapon (§ 30605, subd. (a); count 7), being a felon in possession of ammunition (§ 30305, subd. (a)(1)), exposing a high-capacity magazine for sale (§ 32310, subd. (a)), possession of metal knuckles (§ 21810), and misdemeanor resisting a peace officer (§ 148; count 2). In a bifurcated proceeding, the trial court found true the allegation that Garcia served one prior prison term. Garcia was sentenced to 12 years four months in state prison.

On appeal, Garcia argues that (1) the criminal threats conviction is not supported by substantial evidence, (2) the speech forming the basis of his criminal threats conviction is constitutionally protected, (3) one of his sentences for possessing an assault weapon (counts 5 & 7) should be stayed under section 654, (4) the trial court erred by failing to state reasons for imposing consecutive sentences, (5) the one-year prior prison term enhancement should be stricken, and (6) the trial court erred by failing to consider his ability to pay various fines, fees, and assessments. We agree about the prison prior and remand for resentencing. We therefore do not address Garcia's other claimed errors about sentencing because the trial court can address them at resentencing. We otherwise affirm.

BACKGROUND

On February 21, 2017, Garcia was convicted of a felony. He thereafter was placed on postrelease community supervision. One of the terms of his community supervision prohibited him from possessing firearms.

2

In June 2017, California Highway Patrol (CHP) officer John G. was assigned to the Coachella Valley Violent Task Force (task force), which was a gang and violent crime task force composed of members of various law enforcement agencies.[1] Members of the task force were responsible for monitoring and conducting searches of people on community supervision, parole, and probation.

On June 20, 2017, officer John and other members of the task force conducted a search of Garcia's residence, looking for firearms. One of the task force members had been monitoring Garcia's Facebook page and noticed that Garcia "had been posting some stuff involving guns." In conducting the search, officers located three firearms—a .22-caliber revolver, a .22-caliber rifle, and a .25-caliber semiautomatic handgun. The firearms were found in Garcia's brother's bedroom, which was not locked. Two of the firearms were in a lockbox. Officers seized all three firearms because Garcia had access to them. Garcia was not, however, found to have violated the terms of his community supervision.

While officer John was at Garcia's residence, he wore a vest with "CHP" printed on the back. Garcia asked officer John whether he was a CHP officer, which officer John confirmed. Garcia remarked that he was interested in becoming a CHP officer. Officer John explained that convicted felons are ineligible.

Sometime after the search of his residence, Garcia posted on Facebook: "'The cops broke into my brother's safe and stole three guns under his name. Hashtag, dirty

---

[1]     We refer to the victim by his first name, with or without last initials, to preserve his anonymity. (Cal. Rules of Court, rule 8.90(b).) No disrespect is intended.

cops. What can you do?'" In the following Facebook post, Garcia stated: "'On my life Ima [*sic*] try and take a cop's life. If I die, fuck it, I did it for freedom and for you guys to own firearms and to protect your's [*sic*] guys [*sic*] family. Cops are not here to help hashtag.'"

When he posted those statements, Garcia was in the process of attempting to become a CHP cadet. CHP applicants are required to befriend the CHP on Facebook. The CHP did not conduct background checks on applicants until after applicants completed a written test and a physical agility test. Garcia was scheduled to perform the physical agility test on June 24, 2017. On June 23, 2017, a CHP recruiter was reviewing Garcia's Facebook page and noticed Garcia's Facebook posts about law enforcement and also found photographs of Garcia with various weapons, including brass knuckles with spikes, a sawed-off shotgun, an "AR-15," and a handgun. The recruiter reported what he found to the CHP's investigative services unit, which in turn contacted and involved members of the task force, including officer John, who had conducted the prior search of Garcia's residence.

The same night that the recruiter noticed the Facebook posts a combined team of 12 law enforcement officials went to Garcia's residence. The officers wanted to apprehend Garcia immediately because they were concerned that "something could go really bad" if Garcia attended his scheduled physical agility test the next day. Officer John considered the Facebook post about "tak[ing] a cop's life" to be a threat to all law enforcement personnel. He also believed the threat particularly targeted those law enforcement officers in the area, like himself, who had conducted the search of Garcia's

4

residence. That post caused officer John to be "very concerned" and afraid. Officer John confirmed that he felt "more uniquely targeted" by the post because of his interaction with Garcia during the prior search, which contributed to his being fearful. Officer John did not take any steps to protect himself or his family as a result of Garcia's statement. Officer John explained that he did not take any extra steps to protect his family in part because his "family is always protected because they know how to use firearms" and also because law enforcement was able to detain Garcia and take him into custody on the same night that officer John learned of the threat.

That night, Garcia was detained and arrested at his residence. Garcia did not have a weapon on him, and no weapons were discovered in his residence. Officers were not able to search underneath the trailer because of a barking dog who was there. Officers seized Garcia's computer. The contents of the computer were downloaded, and officers searched Garcia's Facebook account.

Officers discovered numerous Facebook messages, posts, and comments in which Garcia advertised various firearms and ammunition for sale, including an AR-15. Garcia's Facebook account also included numerous photographs of Garcia inside his residence holding the same AR-15.

Garcia referenced other assault weapons in comments he made on Facebook. In one statement, Garcia said, "'All right. Let me get the money, like, in two weeks because I got, like, two . . . AR-15s that I have built.'" The officer testified that this comment was relevant to all of the offenses about the AR-15 (counts 5, 6, & 7). In another message, Garcia commented, "'Yes, I'm going to sell it to one of my homies. Then I'm going to

5

have five AR-15s for sale.'" He also commented on June 3, 2017, that, "I got like 2 AR15s that[] I have built." In another message on May 31, 2017, accompanying a photograph of Garcia with "the AR style platform," Garcia commented, "'I sold it, but I have another one for $750.'"

DISCUSSION

A.  *Criminal Threat*

Garcia was convicted of making a criminal threat based on the language contained in the first sentence of this Facebook post: "'*On my life Ima* [*sic*] *try and take a cop's life*. If I die, fuck it, I did it for freedom and for you guys to own firearms and to protect your's [*sic*] guys [*sic*] family. Cops are not here to help hashtag.'" (Italics added.) He contends that there was not sufficient evidence to support numerous elements of his criminal threats conviction. He also claims that his speech constituted protected political speech. All of his contentions lack merit.

To convict a defendant of making criminal threats under section 422, the prosecution must prove the following five elements: "'(1) that the defendant "willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person," (2) that the defendant made the threat "with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out," (3) that the threat—which may be "made verbally, in writing, or by means of an electronic communication device"—was "on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of

6

execution of the threat," (4) that the threat actually caused the person threatened "to be in sustained fear for his or her own safety or for his or her immediate family's safety," and (5) that the threatened person's fear was "reasonabl[e]" under the circumstances.'" (*In re George T.* (2004) 33 Cal.4th 620, 630 (*George T.*), quoting *People v. Toledo* (2001) 26 Cal.4th 221, 227-228 (*Toledo*); § 422, subd. (a).) "'[T]he determination whether a defendant intended his [or her] words to be taken as a threat . . . can be based on all the surrounding circumstances and not just on the words alone. The parties' history can also be considered as one of the relevant circumstances.'" (*People v. Butler* (2000) 85 Cal.App.4th 745, 754 (*Butler*); *People v. Culbert* (2013) 218 Cal.App.4th 184, 190 (*Culbert*).)

The parties disagree about the applicable standard of review. Relying on *George T.*, *supra*, 33 Cal.4th at page 634, Garcia argues that we should independently review the record because of his claim that his speech amounted to constitutionally protected political hyperbole. In *George T.*, our Supreme Court held that "a reviewing court should make an independent examination of the record in a section 422 case when a defendant raises a plausible First Amendment defense to ensure that a speaker's free speech rights have not been infringed by a trier of fact's determination that the communication at issue constitutes a criminal threat." (*Id.* at p. 632.) The People counter that independent review is not applicable here because Garcia's First Amendment claim is not plausible. Because Garcia raises a First Amendment claim and because the level of review does not affect the outcome of our determination, we independently review the record without resolving the parties' dispute on this point.

7

Independent review in this context is not synonymous with de novo review. (*George T.*, *supra*, 33 Cal.4th at p. 634.)  We do not conduct an "'original appraisal'" of all of the evidence.  (*Ibid.*)  We apply independent review only to those factual findings that implicate the First Amendment, such as a finding that the underlying speech constituted a true threat and therefore was unprotected by the First Amendment.  (*Ibid.*) "Because the trier of fact is in a superior position to observe the demeanor of witnesses, credibility determinations are not subject to independent review, nor are findings of fact that are not relevant to the First Amendment issue." (*Ibid.*)  Our review of factual findings that do not pertain to the constitutional nature of the speech at issue, such as the "sufficiency of the evidence to support the jury's finding on intent[, are] determined according to the usual substantial evidence standard." (*People v. Lopez* (2015) 240 Cal.App.4th 436, 447.)

Under the substantial evidence standard of review, we review "'"the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find [the elements of the crime] beyond a reasonable doubt."'" (*George T.*, *supra*, 33 Cal.4th at pp. 630-631.)  "'"'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also be reasonably reconciled with a contrary finding does not warrant a reversal of the judgment.'"'" (*Id.* at p. 631.)

8

In sum, we generally review the sufficiency of the evidence supporting the criminal threats conviction under the substantial evidence standard, and we independently analyze whether Garcia's statement was constitutionally protected.

Garcia argues that there is not sufficient evidence that he intended his Facebook post to be taken as a threat, because he claims that there is not sufficient evidence that the alleged threat was directed at a specific person or persons, which he claims the plain language of section 422 requires. In support of his claim, however, Garcia focuses exclusively on the words of the threat. He assumes that because the threat did not identify a specific victim by name, there is not sufficient evidence that Garcia specifically intended the statement to be taken as a threat by a specific individual. However, in determining whether Garcia intended that his words be taken as a threat, the jury could consider "'all the surrounding circumstances and not just . . . [his] words alone.'" (*Butler*, *supra*, 85 Cal.App.4th at p. 754.) The jury was so advised by CALCRIM No. 1300, which, as given to the jury, instructed: "In deciding whether a threat was sufficiently clear, immediate, unconditional, and specific, consider the words themselves, as well at the surrounding circumstances."

Garcia relies on *Toledo*, *supra*, 26 Cal.4th at page 235, for his argument that the statutory language requires that the threat identify a specific person or persons. But the Supreme Court did not mandate any such requirement in *Toledo*. Instead, *Toledo* expressly acknowledged that the threat determination includes an assessment of the surrounding circumstances in which the threat was made: "[A] defendant can be found to have committed the crime of attempted criminal threat only if he or she acts with the

9

specific intent to make the very kind of threat—that is, a threat that 'on its face and in the circumstances in which it is made is so unequivocal, unconditional, immediate and specific as to the person threatened as to convey a gravity of purpose and imminent prospect of execution'—to which section 422 applies." (*Toledo*, at p. 232.)

One reasonable inference that the jury could draw from the surrounding circumstances in which Garcia made the statement here is that Garcia intended his statement to be taken as a threat toward officer John specifically. Garcia posted on Facebook that he was going to attempt to "take a cop's life" immediately after officer John and other members of an interagency task force searched Garcia's residence and seized his brother's firearms. When the search was conducted, Garcia specifically remarked on the fact that officer John was a CHP officer. The jury could reasonably infer that Garcia's threat was made in response to that search and seizure because of the timing of the threat and because in Garcia's immediately preceding Facebook post Garcia complained about "dirty cops," whom he accused of stealing his brother's firearms. In addition, when Garcia posted both of those statements on Facebook, he was Facebook friends with the CHP. The jury could reasonably infer from this evidence that Garcia was aware that the CHP had access to his posts. Given that Garcia was simultaneously applying to become a CHP cadet, the jury also could reasonably infer that Garcia was aware when he made the post that the CHP was monitoring his Facebook page. Furthermore, Garcia was scheduled to take a physical agility test with the CHP within days of making the statement on Facebook. The jury therefore could reasonably infer that Garcia intended to implement his plan at that appointment, when he would have

10

access to "cops."  Under these circumstances, although the threat to "take a cop's life" did not specifically mention members of the task force or officer John, the jury could reasonably infer that Garcia's post about taking "a cop's life" specifically targeted officer John—the CHP officer whom Garcia accused of participating in the theft of his brother's weapons.

Garcia also argues that "[t]here is no evidence appellant intended to communicate a threat to any law enforcement officer, let alone any specific law enforcement officer." (See § 422, subd. (a); *George T.*, *supra*, 33 Cal.4th at p. 630.)  On the contrary, the jury could reasonably infer that Garcia intended that his threat be conveyed to officer John based on his Facebook friendship with the CHP.  From that friendship, the jury could reasonably infer that Garcia intended that his threat be seen by the CHP.  Furthermore, given that officer John had participated in the search of Garcia's residence and the alleged theft of Garcia's brother's firearms, about which Garcia expressed frustration, the jury could reasonably infer that Garcia intended that whoever saw the post from the CHP would convey the threat to officer John.  There consequently was sufficient evidence from which the jury could conclude that Garcia intended his threat to be conveyed to officer John.

Garcia's reliance on *People v. Felix* (2001) 92 Cal.App.4th 905 (*Felix*) for the contrary conclusion is misplaced.  In *Felix*, the Court of Appeal concluded that there was insufficient evidence that the defendant intended that his threats be conveyed to the victim.  (*Id.* at p. 913.)  "'When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own

11

facts.'" (*People v. Casares* (2016) 62 Cal.4th 808, 828 (*Casares*), overruled on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214.) In any event, the facts here bear no resemblance to the situation in *Felix*. There, the defendant told a jail psychologist during a private therapy session that he was going to kill his former girlfriend. But there was no evidence that the defendant knew that his therapist was obliged to warn the intended victim or otherwise thought his statement would be conveyed to his former girlfriend. (*Felix*, *supra*, at pp. 908-909, 913-915.) Here, by contrast, Garcia did not communicate his threat under the auspices of a confidential and private communication. Rather, he posted his threat on Facebook while he was Facebook friends with the CHP.

Garcia also contends that his words, "On my life Ima [*sic*] try and take a cop's life" at most constituted an "emotional outburst" or an "angry rant," and not a threat. Section 422 "is not violated by mere angry utterances or ranting soliloquies, however violent." (*People v. Teal* (1998) 61 Cal.App.4th 277, 281.) Instead, the statute "targets only those who try to instill fear in others." (*Felix*, *supra*, 92 Cal.App.4th at p. 913.) However, "'[i]t is the circumstances under which the threat is made that give meaning to the actual words used. Even an ambiguous statement may be a basis for a violation of section 422.'" (*Culbert*, *supra*, 218 Cal.App.4th at p. 190.)

Under the circumstances in which Garcia stated that he was going to "try and take a cop's life," the jury could reasonably conclude that Garcia's Facebook post was a criminal threat and not merely an angry rant. This was not "a vague threat of retaliation without prospect of execution." (*In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1138.) Given that Garcia was Facebook friends with the CHP, had access to numerous firearms

12

according to his other Facebook activity, and was scheduled within days to take a test with the CHP, and given Garcia's awareness of officer John's employment with the CHP, there was substantial evidence that Garcia intended his statement to be taken by officer John as a death threat and not merely an angry utterance. (*People v. Orloff* (2016) 2 Cal.App.5th 947, 953-954 (*Orloff*).)

In support of his argument that his post was "more akin to an angry rant or an emotional outburst than a threat," Garcia relies on numerous cases in which reviewing courts have concluded that the communications in those cases were not threats. (*George T.*, *supra*, 33 Cal.4th at p. 638; *In re Ryan D.* (2002) 100 Cal.App.4th 854, 862 (*Ryan D.*); *Felix*, *supra*, 92 Cal.App.4th at p. 915.) Again, "comparison with other cases is of limited utility" when we decide issues of sufficiency of the evidence. (*Casares*, *supra*, 62 Cal.4th at p. 828.) That is particularly so here because Garcia does not explain how any of those cases are similar to Garcia's statement and the circumstances under which it was made. Nor do we see any similarity.

Two of those cases—*George T.* and *Ryan D.*—involved artistic expressions by minor students (a poem and a painting). In *George T.*, the minor's poem stated that the protagonist *could* become the next school shooter and did "not state that the protagonist plans to kill students." (*George T.*, *supra*, 33 Cal.4th at p. 636.) In *Ryan D.*, a minor submitted to his art class a painting depicting him shooting the police officer who had cited him for marijuana possession a month earlier. (*Ryan D.*, *supra*, 100 Cal.App.4th at pp. 858-859.) The court concluded that the painting itself was ambiguous partly because it was not accompanied by any words, "on the painting or otherwise, such as 'this will be

13

you.'" (*Id*. at p. 864.)  Here, unlike the communications in either *George T.* or *Ryan D.*, Garcia expressed an unequivocal plan to attempt to kill a law enforcement officer, even if it resulted in Garcia's own death.  Nothing about the statement "'Ima [*sic*] try and take a cop's life'" is ambiguous.  *George T.* and *Ryan D.* are therefore dissimilar.

*Felix* is also distinguishable.  In *Felix*, while the defendant was in jail, he confided to a psychologist during a private session that he "'he was thinking about how he was going to kill [his ex-girlfriend] once he was released from jail.'" (*Felix*, *supra*, 92 Cal.App.4th at p. 909.)  The prosecution did not present any evidence about the context in which the remarks were made, such as "what preceded them, why [the defendant] made them, whether they were in response to therapy, or what [the defendant] wanted [the psychologist] to do about them." (*Id.* at p. 914.)  The court concluded that "[b]ecause the prosecution did not adequately prove the factual setting involving [the defendant's] remarks, it did not show whether his words were the product of therapy, ranting soliloquies, or a crime." (*Ibid.*)  In contrast, the circumstances surrounding Garcia's post support and even amplify the nature and gravity of the threat to "take a cop's life."  Garcia had a particular grievance against officer John, had access to firearms, and had an impending appointment with the CHP.

Garcia also maintains that the record does not contain substantial evidence that his statement caused officer John to be in "sustained reasonable fear."  The argument conflates components of the two separate elements in section 422 related to the victim's fear. (*George T.*, *supra*, 33 Cal.4th at p. 630.)  "Sustained" refers to the amount of time that the victim experiences fear.  For purposes of section 422, sustained has been defined

as "a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156.) Although Garcia asserts that there was not sufficient evidence that officer John's fear was sustained, Garcia does not support that assertion with any argument addressing whether officer John experienced fear for the requisite length of time. Instead, Garcia's argument challenges the sufficiency of the evidence that officer John was in fear at all and that the fear was reasonable.

In support of his contention that officer John was not actually in fear, Garcia highlights all of officer John's testimony about his belief that the threat targeted all law enforcement officers. While officer John did repeatedly testify that he believed that the threat targeted all law enforcement officers, officer John also confirmed that he thought the threat specifically targeted him because of his participation in the task force's search of Garcia's residence. Officer John also testified that he was in fear because Garcia's post specifically targeting him. Thus, it is irrelevant whether officer John also believed that the post was about law enforcement generally—he also believed that he was specifically targeted by Garcia's threat, and he was in fear as a result of that belief. The record therefore contains sufficient evidence that officer John feared for his own safety. We do not consider whether other evidence in the record "might also reasonably be reconciled with a contrary finding." (*People v. Albillar* (2010) 51 Cal.4th 47, 60.)

Garcia further maintains that officer John's failure to take any extra precautions to secure his own or his family's safety demonstrates that officer John was not in actual fear as a result of the threat. Officer John explained that he did not take any extra steps to

15

protect his family in part because his "family is always protected because they know how to use firearms" and also because law enforcement was able to detain Garcia and take him into custody on the same night that officer John learned of the threat. Given the swiftness of law enforcement's response to the threat and officer John's belief about his family's ability to protect themselves, the jury could reasonably infer that officer John's failure to take extra precautions to ensure his safety or the safety of his family did not show that he was not fearful.

Garcia also contends that the evidence was insufficient to show that officer John's fear was reasonable. He points out that "no other officer expressed fear of being threatened personally by the post" and that another member of the task force who was part of the previous raid of Garcia's residence testified that he thought that the threat was made toward all law enforcement officers in general and not anyone in particular. Garcia does not provide any citations to any testimony at trial in support of that proposition. With respect to his claim about what the other member of the task force purportedly thought about the post, Garcia cites testimony at the preliminary hearing from a law enforcement officer who did not testify at trial. We do not consider testimony from the preliminary hearing in assessing the sufficiency of the evidence at trial.

In any event, substantial evidence shows that officer John's fear of Garcia was reasonable under the circumstances. Because Garcia's Facebook posts about "dirty cops" who "stole" his brother's firearms and the subsequent post expressing his intention to "take a cop's life" appeared after the task force's search of Garcia's residence, it was reasonable for officer John to infer that the threat to "take a cop's life" referred to the task

16

force that searched Garcia's residence. It was likewise reasonable for officer John to infer that Garcia was targeting officer John in particular, given Garcia's apparent interest in officer John's employment with the CHP during the search and Garcia's scheduled appointment with the CHP. Garcia thus threatened to "take a cop's life" before a scheduled appointment with the law enforcement agency that employed officer John after accusing the officers who searched his home, which included officer John, of stealing his brother's firearms. In addition, officer John knew from Garcia's voluminous posts and comments on Facebook that Garcia likely had access to firearms, including assault weapons. "A reasonable trier of fact could find that . . . [officer John's] fear for his safety 'was "reasonabl[e]" under the circumstances.'" (*Orloff*, *supra*, 2 Cal.App.5th at p. 953.)

Finally, we reject Garcia's contention that his speech amounted to constitutionally protected political hyperbole because he purportedly was making "a political statement in support of [S]econd [A]mendment rights." Garcia failed to raise any First Amendment defense during the trial of this matter, so the argument is forfeited. (*People v. Clayburg* (2012) 211 Cal.App.4th 86, 93 [argument that restraining order violated First Amendment forfeited on appeal because it was not raised in the trial court].) In any event, Garcia claims that his speech is similar to the speech in *Watts v. United States* (1969) 394 U.S. 705, 706-707 (*Watts*) which the United States Supreme Court found to be political hyperbole. In *Watts*, a protestor attending a public rally was convicted of threatening the President by saying to a small group of other attendees, "'If they ever make me carry a rifle the first man I want to get in my sights is L.B.J.'" (*Id.* at p. 706.) Noting that the defendant's language had been conditional and that his listeners had

17

laughed, the Court concluded that the statement was constitutionally protected "political hyperbole" and did not qualify as "a true 'threat.'" (*Id.* at p. 708.) *Watts* explained that the speech "was 'a kind of very crude offensive method of stating a political opposition to the President.'" (*Ibid.*)

Garcia's does not explain how his communication threatening to "take a cop's life" was similar to the protected speech in *Watts*, and we see no similarity. Garcia cannot immunize the statement that he was going to "try and take a cop's life" by invoking the Second Amendment right to bear arms as his reason for doing so. Unlike the speech in *Watts*, Garcia's remark was not made in the context of a political rally or in the context of any political dialogue or exchange. Nor was it conditional. Instead, Garcia, who had access to firearms, threatened to "take a cop's life" days before a scheduled appointment with law enforcement officers. The threat also was not made to a small group of other individuals but rather was posted on Facebook while Garcia was Facebook friends with officer John's employer. Under these circumstances, we conclude that Garcia's communication amounted to a true threat and was not just "'a kind of very crude offensive method of stating a political opposition'" that is constitutionally protected. (*Watts*, *supra*, 394 U.S. at p. 708.)

For all of the foregoing reasons, we conclude that there was sufficient evidence supporting Garcia's conviction for making a criminal threat, and the First Amendment did not protect Garcia's threat.

18

B.      *Section 654—Double Punishment*

Garcia contends that one of his sentences for counts 5 and 7 (felon in possession of a firearm, to wit, an AR-15 (§ 29800)) and possession of an assault weapon (§ 30605, subd. (a)) should be stayed because those convictions purportedly are based on possession of the same weapon.  The contention lacks merit.

Section 654 "'prohibits multiple punishment for the same "act or omission."'" (*People v. Correa* (2012) 54 Cal.4th 331, 337.)  "'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.'" (*Id.* at p. 336.)  However, a defendant may be punished for each offense, "[i]f he [or she] entertained multiple criminal objectives which were independent of and not merely incidental to each other . . . even though the violations shared common acts or were parts of an otherwise indivisible course of conduct." (*People v. Beamon* (1973) 8 Cal.3d 625, 639.)

"In the absence of any reference to [section 654] during sentencing, the fact that the court did not stay the sentence on any count is generally deemed to reflect an implicit determination that each crime had a separate objective." (*People v. Tarris* (2009) 180 Cal.App.4th 612, 626 (*Tarris*).)  We will uphold the trial court's express or implied finding that a defendant harbored a separate intent and objective for each offense if the finding is supported by substantial evidence. (*Id.* at pp. 626-627.)  "We review the trial court's determination in the light most favorable to the [People] and presume the

19

existence of every fact the trial court could reasonably deduce from the evidence."
(*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

The convictions for counts 5 and 7 are based on Garcia's possession of an assault weapon on different days—June 23, 2017, and May 30, 2017. The only photographic evidence of Garcia holding an assault weapon was of Garcia holding the same AR-15. From this, Garcia deduces that the assault weapon possession convictions were based on his possession of the same assault weapon, which he maintains amounts to a single act with a single objective and thus requires that one of his sentences be stayed under section 654. (See *People v. Spirlin* (2000) 81 Cal.App.4th 119, 130-131.)

The People counter that section 654 does not apply because there was substantial evidence that Garcia possessed more than one assault weapon, which supports the trial court's implied finding that Garcia harbored a separate intent and objective for each of the assault weapon possession counts. We agree. The photographs of Garcia holding the AR-15 were not the only evidence presented about Garcia's possession of assault weapons. In numerous Facebook comments, Garcia referred to possessing more than one AR-15. One of those messages accompanied a photograph of Garcia holding an AR-15 and was made on May 31, 2017—in between the dates for the two assault weapons possession offenses. He indicated that he had sold the weapon in the photograph but had another one for sale. In addition, on June 3, 2017, Garcia commented that he had two AR-15s that he had built. Given this evidence of Garcia's possession of more than one assault weapon in between the two dates of conviction for counts 5 and 7, substantial evidence supports the trial court's implied finding that Garcia harbored a separate intent

20

and objective for each of the assault weapon possession offenses.  We therefore conclude that the trial court's failure to stay the sentences imposed for the assault weapon possession offenses (counts 5 & 7) is supported by substantial evidence.

We reject Garcia's request that we remand the case for the trial court to make explicit findings about whether Garcia's sentences for counts 5 and 7 are actually based on his possession of different assault weapons.  He maintains that such a remand is necessary to ensure that he "is not being punished twice for the same offense in violation of section 654."  The trial court is not required to make express findings under section 654.  (*Tarris*, *supra*, 180 Cal.App.4th at p. 626.)

C.      *Sentencing Issues*

Garcia raises numerous issues related to sentencing.  He argues that (1) the trial court improperly failed to state its reasons for imposing consecutive sentences; (2) the trial court erred by failing to determine whether Garcia had the ability to pay the imposed fines, fees, and assessments; and (3) his one prior prison term enhancement should be stricken in light of Senate Bill No. 136.  The People agree about the prior prison term enhancement.  They also do not dispute that the trial court erred in failing to provide a statement of reasons for the consecutive sentences.  Instead, the People argue that Garcia forfeited his argument about the statement of reasons and that any error was harmless. The People also request, however, that we remand for resentencing instead of just striking the one-year prior prison term enhancement.  We agree that remand for resentencing is appropriate.  Because we must remand the matter for resentencing and because we agree that the trial court erred by failing to provide a statement of reasons for

21

imposing consecutive sentences, we need not address the additional arguments raised about sentencing.

Effective January 1, 2020, while this appeal was pending, Senate Bill No. 136 (2019-2020 Reg. Sess.) (Stats. 2019, ch. 590) amended section 667.5, subdivision (b), to restrict imposition of the one-year prior prison term enhancement to sexually violent offenses. (§ 667.5, subd. (b).) Garcia's underlying conviction, for which the trial court imposed the one-year enhancement, was not a sexually violent offense. The parties agree and this court has already held that Senate Bill No. 136 applies retroactively to those like Garcia whose sentences were not final when Senate Bill No. 136 became effective. (*People v. Chubbuck* (2019) 43 Cal.App.5th 1, 13-14.) We consequently order the trial court to strike the one-year prior prison term enhancement.

For the misdemeanor resisting arrest conviction (§ 148), the trial court imposed a one-year sentence to run concurrently. As the People correctly observe, that term could instead have been imposed to run consecutively to the terms for the felony convictions. (*People v. Brown* (2016) 247 Cal.App.4th 1430, 1433-1436.) Consequently, because the trial court did not impose the maximum sentence possible, "we remand the matter for resentencing to allow the court to exercise its sentencing discretion in light of the changed circumstances." (*People v. Jennings* (2019) 42 Cal.App.5th 664, 682; *People v. Buycks* (2018) 5 Cal.5th 857, 893.) The sentence imposed on resentencing may not exceed the original aggregate sentence. (*People v. Jones* (1994) 24 Cal.App.4th 1780, 1783-1784; *People v. Hanson* (2000) 23 Cal.4th 355, 357-358.)

Our remand for resentencing eliminates the need for us to consider whether Garcia's remaining arguments concerning sentencing succeed in showing prejudicial error. We agree with Garcia that the trial court erred by failing to state its reasons for imposing consecutive sentences. (§ 1170, subd. (c) ["The court shall state the reasons for its sentence choice on the record at the time of sentencing"]; Cal. Rules of Court, rule 4.406(b)(5); *People v. Bejarano* (1981) 114 Cal.App.3d 693, 704.) But we need not determine whether the error was harmless. At resentencing, the trial court will have another opportunity to state its reasons for imposing consecutive sentences. In addition, Garcia will have the opportunity to present evidence and argument concerning his ability to pay any fines, fees, and assessments.

## DISPOSITION

The sentence is vacated, the trial court is directed to strike the one-year prior prison enhancement under section 667.5, subdivision (b), and the matter is remanded for resentencing. The trial court shall forward the amended abstract of judgment to the California Department of Corrections and Rehabilitations. In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ_____
J.

We concur:

SLOUGH_____
　　　　　Acting P. J.
FIELDS_____
　　　　　J.

23